IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA

Christopher S.,[1]              )      C/A No.: 1:21-1484-SVH
                               )
            Plaintiff,         )
                               )
    vs.                        )
                               )      ORDER
Kilolo Kijakazi,[2] Acting     )
Commissioner of Social Security )
Administration,                )
                               )
            Defendant.         )
_____)

This appeal from a denial of social security benefits is before the court

on Plaintiff's motion for remand under sentence six of 42 U.S.C. § 405(g),

ECF No. 19, and for a final order pursuant to 28 U.S.C. § 636(c), Local Civ.

Rule 73.01(B) (D.S.C.). By order of the Honorable R. Bryan Harwell, Chief

United States District Judge, dated June 16, 2021, this matter was referred

to the undersigned for disposition. [ECF No. 7]. The parties consented to the

undersigned United States Magistrate Judge's disposition of this case, with

any appeal directly to the Fourth Circuit Court of Appeals. [ECF No. 6].

---

[1] The Committee on Court Administration and Case Management of the
Judicial Conference of the United States has recommended that, due to
significant privacy concerns in social security cases, federal courts should
refer to claimants only by their first names and last initials.
[2] Kilolo Kijakazi became the Acting Commissioner of Social Security on July
9, 2021. Pursuant to Fed. R. Civ. P. 25(d), she is substituted for former
Commissioner Andrew Saul as the defendant in this action.

Plaintiff files this appeal pursuant to 42 U.S.C. § 405(g) of the Social Security Act ("the Act") to obtain judicial review of the final decision of the Commissioner of Social Security ("Commissioner") denying the claim for disability insurance benefits ("DIB"). The two issues before the court are whether the Commissioner's findings of fact are supported by substantial evidence and whether she applied the proper legal standards. For the reasons that follow, the court denies Plaintiff's motion for remand pursuant to sentence six of 42 U.S.C. § 405(g), ECF No. 19, and affirms the Commissioner's decision.

I.    Relevant Background

A.    Procedural History

On April 9, 2019, Plaintiff protectively filed an application for DIB in which he alleged his disability began on March 19, 2015. Tr. at 67, 150–53. His application was denied initially and upon reconsideration. Tr. at 82–85, 87–91. On August 18, 2020, Plaintiff had a hearing by telephone before Administrative Law Judge ("ALJ") Carl Watson. Tr. at 30–50 (Hr'g Tr.). The ALJ issued an unfavorable decision on October 28, 2020, finding that Plaintiff was not disabled within the meaning of the Act. Tr. at 12–29. Subsequently, the Appeals Council denied Plaintiff's request for review, making the ALJ's decision the final decision of the Commissioner for purposes of judicial review. Tr. at 1–6. Thereafter, Plaintiff brought this

action seeking judicial review of the Commissioner's decision in a complaint filed on May 19, 2021. [ECF No. 1].

B.    Plaintiff's Background and Medical History

1.    Background

Plaintiff was 47 years old at the time of the hearing. Tr. at 33. He completed high school and one year of college. *Id.* His past relevant work ("PRW") was as an auto body technician. Tr. at 34. He alleges he has been unable to work since March 19, 2015. Tr. at 150.

2.    Medical History

Plaintiff presented to his primary care physician, Michael R. Smith, M.D. ("Dr. Smith"), on March 19, 2015. Tr. at 523. He reported a severe exacerbation of back pain over the prior few days. *Id.* Subsequent records indicate Plaintiff sustained an on-the-job injury to his back while lifting seats out of a pickup truck. Tr. at 561. X-rays of Plaintiff's lumbar spine revealed grade 1 to grade 2 spondylolisthesis. Tr. at 523. Dr. Smith noted 5/5 strength in the bilateral upper and lower extremities, intact sensation, gait within normal limits, symmetric bilateral deep tendon reflexes ("DTRs"), paraspinal muscle spasm in the lumbar region, tenderness to palpation ("TTP") over the bilateral lower lumbar region, decreased bending/anterior flexion of the lower back secondary to pain, and negative bilateral straight-leg raising ("SLR")

test. *Id.* He referred Plaintiff to a specialist, administered a Toradol injection, and prescribed Norco for pain control. *Id.*

Orthopedist James K. Aymond, M.D. ("Dr. Aymond"), first examined Plaintiff on April 10, 2015. Tr. at 275. Plaintiff complained of low back and upper lumbar discomfort, but denied radicular pain in the lower extremities. Tr. at 275. Dr. Aymond noted Plaintiff walked with a slow, deliberate gait, had some limited mobility of the lumbar spine in flexion and extension, had 1–2+ reflexes in the patella and Achilles tendons, showed slightly-diminished sensation in the L5 dermatome distribution, demonstrated no weakness on manual motor testing, and had positive SLR test. Tr. at 275–76. He ordered magnetic resonance imaging ("MRI") of Plaintiff's lumbar spine and indicated he should remain out of work pending its results. Tr. at 276.

On April 15, 2015, an MRI of Plaintiff's lumbar spine showed mild anterolisthesis of L4 on L5, associated with mild degenerative disc disease ("DDD"), as well as mild central canal protrusion at the L5–S1 level. Tr. at 371–72.

Plaintiff returned to Dr. Aymond to review the results of the MRI on May 5, 2015. Tr. at 273. He reported pain in his lower back, bilateral buttocks, and posterior thigh. *Id.* Dr. Aymond observed limited mobility of the lumbar spine in flexion and extension, 1–2+ reflexes in the patella and Achilles tendons, and positive SLR. *Id.* He noted the MRI showed a grade 1

4

spondylolisthesis at the L4–5 level and evidence of central disc protrusion and desiccation at the L5–S1 level. *Id.* He assessed acquired spondylolisthesis and displacement of lumbar intervertebral disc, prescribed Norco 7.5-325 mg every six hours, as needed, and ordered two L4–5 epidural steroid injections ("ESIs"). Tr. at 274.

On June 9, 2015, Plaintiff reported no improvement from physical therapy and ESIs. Tr. at 270. Dr. Aymond observed limited mobility of the lumbar spine in flexion and extension, TTP and palpable step-off over the lower lumbar spine, positive SLR test, intact sensory exam, and 1–2+ reflexes in the patella and Achilles tendons. Tr. at 271. He recommended L4–5 and L5–S1 posterior lumbar interbody fusion ("PLIF"), posterior lateral fusion with instrumentation, and iliac crest bone graft harvest for arthrodesis. *Id.* He advised Plaintiff to stop smoking immediately. *Id.* Plaintiff opted to proceed with surgery. *Id.* Dr. Aymond continued Plaintiff's other medications and prescribed Norco 7.5-325 mg every six hours, as needed. *Id.*

On July 1, 2015, Dr. Aymond performed PLIF and posterior lateral fusion at L4–5 and L5–S1 with K2 instrumentation and iliac crest bone graft harvest. Tr. at 267.

Plaintiff returned to Dr. Aymond for a postoperative visit on July 10, 2015. Tr. at 267. He reported back pain, but denied lower extremity dysesthesia. *Id.* Dr. Aymond observed moderate swelling, well-healing

incisions, no evidence of erythema or drainage, and normal motor strength and sensation. *Id.* He prescribed Percocet 7.5-325 mg every four to six hours and advised Plaintiff to remain out of work, to lift no greater than 10 pounds, and to avoid driving. *Id.*

Plaintiff described pain in his right inguinal and testicular areas on July 21, 2015. Tr. at 265. Dr. Aymond observed well-healing incisions, no TTP over the incision sites, focal tenderness in the area of the right inguinal ligament and groin area, and no evidence of rash, erythema, or right lower quadrant tenderness. *Id.* He prescribed Percocet 7.5-325 mg every four to six hours. Tr. at 266.

Plaintiff followed up with Dr. Smith on July 22, 2015. Tr. at 521. He complained of pain in the right suprapubic area that was exquisitely tender to touch. *Id.* He described a burning-type pain and numbness over the right quadriceps area. *Id.* Dr. Smith considered Plaintiff's symptoms most likely related to complications from back surgery. *Id.* He ordered a bladder ultrasound and prescribed Lyrica 50 mg twice a day. *Id.* The ultrasound showed normal appearance of the kidneys and bladder and a mildly-enlarged prostate gland. Tr. at 532.

On August 4, 2015, Plaintiff reported overall improvement with some lateral thigh dysesthesia and persistent inguinal and groin area discomfort, slightly more prominent on the right. Tr. at 263. Dr. Aymond noted well-

healed incisions, normal sensation and motor strength, and positive SLR. *Id.* Post-surgical x-rays showed possible slight posterior migration of the interbody fusion grafts. Tr. at 264. Dr. Aymond prescribed Percocet 5-325 mg every four hours and ordered a computed tomography ("CT") scan. Tr. at 263.

On August 6, 2015, the CT scan of Plaintiff's lumbar spine showed a grade 1 spondylolisthesis with moderate loss of disc height, patent central canal, mild bilateral neural foraminal stenosis, and intertransverse graft without solid osseous bridging. Tr. at 369–70.

Plaintiff presented to Michael Wildstein, M.D. ("Dr. Wildstein"), for a consultation on October 2, 2015. Tr. at 561. He reported little relief of his back pain following surgery and new onset of numbness in his bilateral legs to his feet. *Id.* He rated his pain as a nine and was ambulating with a cane. *Id.* Dr. Wildstein observed full range of motion ("ROM") at Plaintiff's hips, knees, and ankles, 5/5 strength in the bilateral lower extremities, TTP over the posterior lumbar spine, decreased ROM of the lumbar spine to the right and left, intact DTRs in the bilateral upper extremities, slightly reduced DTRs in the bilateral lower extremities, negative bilateral SLR test, and inability to heel, toe, and tandem walk without difficulty. *Id.* Dr. Wildstein explained the CT scan showed the left-sided interbody cage had migrated approximately 5 mm into the spinal canal and the right-sided cage's marker

was flush with the posterior aspect of the vertebral body, suggesting some interference in the spinal canal. Tr. at 564. He noted:

> I think that at this point, given the wide laminectomy performed at L5–S1 and the fact that there does not appear to be fusion of the interbody device, I would recommend an anterior approach to remove the cages with placement of an anterior interbody cage. Unfortunately this would necessitate first loosening the rods posteriorly to enable removal of the devices anteriorly, followed by going posteriorly to re-secure the rods once the anterior portion is complete. I informed the patient that I did not know whether this would help his leg paresthesias since he states that this started post-operatively but presumably the cages did not migrate until sometime in the post-operative period. I do think that revision is necessary, though due to the position of the cages currently.

Tr. at 564–65.

On October 16, 2015, Plaintiff complained of pain in his lower back, bilateral buttocks, and posterior thighs. Tr. at 260. Dr. Aymond noted Plaintiff continued to smoke cigarettes, despite preoperative and postoperative recommendation to stop. *Id.* He observed well-healed posterior incisions, limited ROM of the lumbar spine due to guarding, 1–2+ reflexes in the patella and Achilles tendons, and positive SLR test. Tr. at 260–61. He recommended and sought approval for anterior lumbar interbody fusion at the L5–S1 level with removal of interbody fusion cages, followed by insertion of an L5–S1 anterior cage with screw fixation and use of bone morphogenic protein. *Id.* He refilled Percocet. *Id.*

Plaintiff presented to Donald R. Johnson, II, M.D. ("Dr. Johnson"), for an independent medical evaluation ("IME") on October 20, 2015. Tr. at 379. He rated pain in his low back, bilateral legs, and right groin and testicular areas as a seven. *Id.* Dr. Johnson observed limited ROM and slightly more tenderness in the left than right sciatic notch. *Id.* He noted the interbody cage at L5–S1 had moved, causing some compression into the spinal canal. Tr. at 380. He agreed with the recommendation for surgical intervention for removal of the cages and redo fusion at L5–S1. *Id.*

Dr. Smith refilled Mobic 15 mg, Paxil 10 mg, and Percocet 7.5-325 mg on November 30, 2015. Tr. at 520. He refilled Percocet 7.5-325 mg for pain control on January 11, 2016. Tr. at 517.

On February 3, 2016, an MRI of Plaintiff's right hip showed probable, but somewhat atypical-appearing avascular necrosis of the right femoral head. Tr. at 365–66.

Dr. Smith refilled Percocet 7.5-325 mg on February 15, 2016. Tr. at 515.

On February 24, 2016, Thomas J. Holbrook, Jr., M.D. ("Dr. Holbrook"), noted Plaintiff had been identified as having avascular necrosis of the right femoral head and required further evaluation by an orthopedist prior to consideration for revision of lumbar fusion. Tr. at 361.

Dr. Smith refilled Percocet 7.5-325 mg on March 25, 2016. Tr. at 513.

On May 9, 2016, Plaintiff complained of moderate-to-severe lumbar pain that caused difficulty with lifting, bending, stooping, and all other physical activity. Tr. at 511. He reported maximum ability to stand for 10 minutes and sit for 30 minutes. *Id.* He indicated he needed a cane to assist his ambulation. *Id.* Dr. Smith noted 5/5 strength in the bilateral upper and lower extremities, intact sensation, gait within normal limits, symmetric bilateral DTRs, paraspinal muscle spasm in the lumbar region, TTP over the bilateral lower lumbar region, decreased bending/anterior flexion of the lower back secondary to pain, and negative bilateral SLR. *Id.* He refilled Percocet 7.5-325 mg. *Id.*

Plaintiff followed up with Dr. Smith for medication refills on July 25, 2016. Tr. at 509. Dr. Smith observed 5/5 strength in the bilateral upper and lower extremities, intact sensation, gait within normal limits, symmetric bilateral DTRs, paraspinal muscle spasm in the lumbar region, TTP over the bilateral lower lumbar region, decreased bending/anterior flexion of the lower back secondary to pain, and negative bilateral SLR. *Id.* He refilled Percocet 7.5-325 mg every six hours. *Id.*

On August 24, 2016, Plaintiff described low back pain that radiated down both legs to his feet and was accompanied by intermittent numbness, tingling, easy fatigability, and weakness in the lower extremities. Tr. at 357. Dr. Holbrook noted TTP of the lower lumbar paraspinous muscles, limited

ROM of the lumbar spine, slow and guarded gait, no gross focal motor deficits, and decreased sensation to pinprick below the right knee and the inguinal ligament on the left. Tr. at 358–59. He discussed revision of the fusion at L5–S1 to relieve the encroachment on Plaintiff's spinal cord caused by the interbody devices. Tr. at 359. Plaintiff expressed a desire to proceed with surgery. *Id.*

Dr. Holbrook performed revision PLIF at the L5–S1 level on September 27, 2016. Tr. at 354.

Plaintiff reported some improvement in his leg numbness on October 31, 2016. Tr. at 353. He continued to endorse low back pain. *Id.* Dr. Holbrook prescribed Flexeril, refilled Percocet, and instructed Plaintiff to continue Mobic. *Id.* He indicated Plaintiff should remain out of work until he completed physical therapy. *Id.*

On January 9, 2017, Plaintiff complained of low back pain down the posterior thigh that was worse on the right. Tr. at 351. Dr. Holbrook noted some TTP over the lumbar paraspinous muscles with decreased ROM of the lumbar spine due to exacerbation of back pain, guarded gait, and decreased sensation to pinprick over the bilateral posterior lateral thighs. Tr. at 351. He prescribed Cymbalta 60 mg and referred Plaintiff for physical therapy. *Id.* He stated Plaintiff "could do sedentary only work at this time." *Id.*

Plaintiff participated in 18 physical therapy visits from January 30 through March 20, 2017. Tr. at 279–323. At the time of discharge, he demonstrated reduced ROM of the lumbar spine and bilateral hips, 3/5 right hip flexion, 4/5 left hip flexion, 3+/5 bilateral hip internal rotation, 3+/5 right hip external rotation, 4/5 left hip external rotation, 4/5 right knee flexion, 4+/5 left knee flexion, 3+/5 right knee extension, 4+/5 left knee extension, positive SLR on the right, negative SLR on the left, positive Thomas test, pain, and TTP. Tr. at 279–81. Plaintiff was unable to meet his goals for reducing radiculopathy and increasing ROM. Tr. at 281. His core remained weak, which made strengthening exercises difficult. Tr. at 284. He reported little improvement in his back pain. Tr. at 288.

On April 3, 2017, Plaintiff complained of constant low back pain that radiated down his bilateral legs and into his feet. Tr. at 348. He reported 25% improvement in pain following the revision surgery. *Id.* Dr. Holbrook noted TTP over the lower lumbar paraspinous muscles, limited ROM of the lumbar spine due to exacerbation of back pain, guarded gait, decreased effort on manual muscle testing of the lower extremities due to pain, and decreased sensation to pinprick over the bilateral lateral thighs. Tr. at 349. He indicated Plaintiff continued to have significant back and bilateral leg pain and had failed to improve with conservative measures. *Id.* He referred

Plaintiff for consideration for a spinal cord stimulator ("SCS") and continued Norco 5-325 mg every four to six hours as needed for pain. *Id.*

Plaintiff presented to Steven B. Storick, M.D. ("Dr. Storick"), for an IME on May 30, 2017. Tr. at 345. He complained of constant low back pain extending across his waist, a shooting pain into his right groin, and intermittent pain in his legs. *Id.* Dr. Storick noted diffuse tenderness along the lumbosacral junction, decreased sensation to light touch along the left leg in an L5 distribution, 5/5 motor function, 1+ and equal DTRs in the upper and lower extremities, negative SLR, and normal gait without footdrop. *Id.* He assessed chronic postoperative pain, low back pain, and lumbosacral radiculitis. Tr. at 345–46. He noted the diagnostic tests showed diffuse degenerative and postoperative changes, but no compressive lesions potentially responsive to surgery that would relieve Plaintiff's painful symptoms. Tr. at 346. He discussed treatment options, including a high frequency SCS trial, provided information for Plaintiff to review about the treatment, and recommended follow up in a few weeks to further discuss it. *Id.*

Dr. Storick addressed Plaintiff's concerns as to an SCS on June 13, 2017. Tr. at 340. He referred Plaintiff for a psychological evaluation and indicated he would need thoracic MRI placement of the electrodes prior to an SCS trial. *Id.*

13

On June 23, 2017, an MRI of Plaintiff's thoracic spine showed an old severe anterior compression fracture of T5 with resultant gibbous and mild scoliosis. Tr. at 341.

Plaintiff described pain in his back, bilateral legs, and right groin on July 18, 2017. Tr. at 336. Dr. Storick explained the protocols and procedures for SCS trial and instructed Plaintiff that he needed to abstain from marijuana and alcohol use if he wanted to continue use of prescription drugs. Tr. at 337.

On September 29, 2017, Plaintiff rated his pain level without medication as an eight to nine and with medication as a two to three. Tr. at 507. Dr. Smith noted 5/5 strength in the bilateral upper and lower extremities, intact sensation, gait within normal limits, symmetric bilateral DTRs, paraspinal muscle spasm in the lumbar region, TTP over the bilateral lower lumbar region, decreased bending/anterior flexion of the lower back secondary to pain, and negative bilateral SLR test. *Id.* He refilled Tramadol and Mobic. Tr. at 508.

On October 26, 2017, Dr. Smith noted 5/5 strength in the bilateral upper and lower extremities, intact sensation, gait within normal limits, symmetric bilateral DTRs, paraspinal muscle spasm in the lumbar region, TTP over the bilateral lower lumbar region, decreased bending/anterior flexion of the lower back secondary to pain, and negative bilateral SLR test.

Tr. at 505. He prescribed Flexeril 10 mg, Percocet 7.5-325 mg, and Neurontin 600 mg. Tr. at 505–06.

On November 28, 2017, Plaintiff complained of chronic back pain that radiated down the right greater than left leg. Tr. at 333. He reported taking half a Percocet 7.5 mg tablet once or twice a day, as well as Tramadol 50 mg three to four times a day. *Id.* He felt a prior T5 compression fracture was exacerbated by his work-related injury and felt he needed pain medication for his daily upper back pain. *Id.* Dr. Storick recorded normal findings on exam, aside from a moderate amount of upper thoracic kyphosis. Tr. at 334. He explained an SCS would not cover Plaintiff's upper back pain, and he would need to discontinue opioid use if he pursued it. *Id.* He advised Plaintiff to consider whether to pursue the SCS and wean from opioids. *Id.*

On February 8, 2018, Dr. Storick noted Plaintiff used a cane to ambulate, but had no footdrop. Tr. at 331. He observed 5/5 motor strength and negative SLR. *Id.* He stated Plaintiff had reached maximum medical improvement and did not wish to pursue an SCS trial. *Id.* He felt it was reasonable for Plaintiff to continue use of Tramadol three times a day and undergo a functional capacity evaluation to assess his permanent work status. *Id.* He assessed a 33% impairment rating to the whole person, using the American Medical Association Guidelines to the Evaluation of Permanent Impairment, Fifth Edition. *Id.*

Plaintiff returned to Dr. Johnson with complaints of back and leg pain on March 12, 2018. Tr. at 376. He indicated he was not interested in an SCS. *Id.* Dr. Johnson observed somewhat antalgic gait and paresthesia through the posterior aspect of the right lower extremity. *Id.* He stated Plaintiff had reached maximum medical improvement from a surgical standpoint. *Id.* He warned Plaintiff was at risk for further deterioration of his spine at L3–4 and recommended his medical treatment case remain open. *Id.* He assigned a 23% impairment rating to Plaintiff's whole person and explained this would equate to a 33% impairment to the lumbar spine. *Id.* He wrote:

> I do not feel the patient is employable. He certainly could not return to his previous vocation as an autobody technician. Typical restrictions would be avoid repetitive bending and no lifting over 10 pounds. He is at risk for breakdown at the level above his two-level fusion L3–L4.

> I do not feel the patient would be able to do sedentary work as he will need not only to have medications that could cause loss of time from work and sedation, but he would need to be able to move from sitting, standing, walking position every 10–15 minutes.

Tr. at 377.

On May 3, 2018, Plaintiff requested Chantix for smoking cessation and refills of Neurontin, Percocet, and Tramadol for chronic low back pain. Tr. at 496. He reported his medications caused no complications and significantly improved his functional status. *Id.* Dr. Smith noted 5/5 strength in the bilateral upper and lower extremities, intact sensation, gait within normal

limits, symmetric bilateral DTRs, paraspinal muscle spasm in the lumbar region, TTP over the bilateral lower lumbar region, decreased bending/anterior flexion of the lower back secondary to pain, and negative bilateral SLR test. Tr. at 496–97. He prescribed Chantix and refilled Plaintiff's other medications. Tr. at 497.

Plaintiff was hospitalized at Colleton Medical Center on June 24 and 25, 2018, following a Copperhead snake bite to his right medial ankle. Tr. at 466. He reported walking along a dirt road with bare feet when he was suddenly bitten by the snake. Tr. at 477. His other diagnoses included hypokalemia and hypertension. Tr. at 467.

Plaintiff was hospitalized at Colleton Medical Center from July 4 through July 7, 2018, for fever of unknown etiology, possibly due to infection from the recent snake bite. Tr. at 407. His other diagnoses included pancytopenia, nausea and vomiting, and elevated liver function, possibly due to alcoholism. *Id.* When asked about tick exposure, "[h]e said ticks attached to him most recently a couple months ago as he is outdoors in the woods almost every day and has had to encounter ticks quite often." Tr. at 422. He reported he was "working for himself at this point." Tr. at 423.

On July 19, 2018, Plaintiff requested he be scheduled for a swallowing study due to feeling as if his food were sticking in the lower aspect of his neck. Tr. at 494. The swelling in his left foot from the snake bite had mostly

resolved. *Id.* Dr. Smith ordered upper gastrointestinal imaging that showed no abnormalities. Tr. at 495, 501.

Plaintiff complained of low back and right knee pain on August 30, 2018. Tr. at 492. He indicated good results from Percocet for pain control and Neurontin for neuropathic symptoms. *Id.* Dr. Smith noted 5/5 strength in the bilateral upper and lower extremities, intact sensation, gait within normal limits, symmetric bilateral DTRs, paraspinal muscle spasm in the lumbar region, TTP over the bilateral lower lumbar region, decreased bending/anterior flexion of the lower back secondary to pain, and negative bilateral SLR. *Id.* He refilled Neurontin and Percocet. *Id.*

Plaintiff reported mild, intermittent chest pain on December 6, 2018. Tr. at 490. He indicated he was using Percocet intermittently, Tramadol for breakthrough pain, and Meloxicam as an anti-inflammatory. *Id.* He denied complications from medication use and indicated he was otherwise doing well. *Id.* An electrocardiogram ("EKG") was normal. *Id.* Dr. Smith noted 5/5 strength in the upper and lower extremities, intact sensation, gait within normal limits, symmetric bilateral DTRs, paraspinal muscle spasm in the lumbar region, TTP over the bilateral lower lumbar region, decreased bending/anterior flexion of the lower back secondary to pain, and negative bilateral SLR test. Tr. at 491. He assessed lumbago with right-sided sciatica and chest pain and refilled Plaintiff's medications. *Id.*

On April 5, 2019, Plaintiff reported his neuropathy symptoms were well-controlled by using Neurontin 600 mg three times a day. Tr. at 488. Dr. Smith noted 5/5 strength in the bilateral upper and lower extremities, gait within normal limits, symmetric bilateral DTRs, paraspinal muscle spasm in the lumbar region, TTP over the bilateral lower lumbar region, decreased bending/anterior flexion of the lower back secondary to pain, and negative bilateral SLR test. *Id.* He refilled Neurontin. *Id.*

Plaintiff complained of increasing neck pain on July 1, 2019. Tr. at 577. Bryan D. Tompkins, D.O. ("Dr. Tompkins"), noted limited flexion and extension of the low back and increasing pain in the paraspinal musculature of the cervical spine with no focal neurologic deficits. *Id.* He refilled Percocet 7.5-325 mg.

On July 9, 2019, state agency psychological consultant Holly Hadley, Psy. D., reviewed the record, considered Listing 12.06 for anxiety and obsessive-compulsive disorders, and assessed a non-severe mental impairment. Tr. at 59–60.

On July 22, 2019, state agency medical consultant Jean Smolka, M.D. ("Dr. Smolka"), reviewed the evidence and assessed Plaintiff's physical residual functional capacity ("RFC") as follows: occasionally lift and/or carry 10 pounds; frequently lift and/or carry less than 10 pounds; stand and/or walk for a total of two hours; sit for a total of about six hours in an eight-hour

workday; frequently balance, kneel, and crouch; occasionally stoop, crawl, and climb ramps and stairs; never climb ladders, ropes, or scaffolds; and avoid concentrated exposure to hazards. Tr. at 61–64.

Dr. Smith refilled Mobic 15 mg, Ultram 50 mg, Percocet 7.5-325 mg, and Neurontin 600 mg on October 24, 2019. Tr. at 589.

George Walker, M.D. ("Dr. Walker"), reviewed the record at the reconsideration stage and assessed the following physical RFC on December 12, 2019: occasionally lift and/or carry 10 pounds; frequently lift and/or carry 10 pounds; stand and/or walk for a total of four hours; sit for a total of about six hours in an eight-hour workday; occasionally balance, stoop, kneel, crouch, crawl, and climb ramps, stairs, ladders, ropes, and scaffolds; and avoid concentrated exposure to hazards. Tr. at 75–78.

On March 3, 2020, Plaintiff reported low back pain with use of Percocet that significantly improved his functional status. Tr. at 586. He described occasional neck pain and bilateral upper extremity numbness that started in his hands, worked its way up to his arms, and occurred while driving and mainly at night. *Id.* Dr. Smith refilled Percocet and referred Plaintiff for nerve conduction studies ("NCS"). Tr. at 587.

On April 21, 2020, the NCS revealed mild bilateral carpal tunnel syndrome, worse on the left. Tr. at 580.

Dr. Smith refilled Ultram and Mobic on May 13, 2020. Tr. at 585.

Dr. Smith completed a treating physician's statement on August 5, 2020. Tr. at 592–98. He represented he was board-certified in family medicine and had practiced as a physician for 20 years. Tr. at 592. He stated he had served as Plaintiff's treating physician beginning around 2013 and had last treated Plaintiff on August 5, 2020. Tr. at 593. He checked a box indicating Plaintiff's statements that he had "been unable to sustain prolonged sitting/standing/walking due to his severe lower back pain and nerve damage, that he has experienced difficulty with lifting and carrying, and has difficulties using his hands due to loss of strength, numbness, and nerve damage" were consistent with the objective medical evidence. *Id.* He indicated Plaintiff: could occasionally lift and/or carry less than 10 pounds; could engage in no frequent lifting or carrying; could stand for less than two hours in an eight-hour workday; required use of a cane for walking on rough/uneven terrain, bending, and stooping; could occasionally bend at the waist; had limited ability to push and/or pull with the upper and lower extremities; could sit for less than two hours in an eight-hour workday; and could engage in occasional handling, fingering, and feeling. Tr. at 594–96. He noted pain or other discomfort and side effects of prescription medications would cause significant limitation in Plaintiff's abilities to concentrate, remain alert, think clearly, or otherwise attend to work tasks to completion during 20% to 50% of a workday or workweek. Tr. at 597. He stated episodes

of increased symptoms and/or medical treatment during normal working hours would cause absences from work on four or more days per month. Tr. at 598. He indicated Plaintiff had no ability to sustain any type of work activity at any exertional level due to his impairments. *Id.* He represented Plaintiff's impairment was permanent and that no significant improvement was expected. *Id.*

C.   The Administrative Proceedings

1.   The Administrative Hearing

a.   Plaintiff's Testimony

At the hearing on August 18, 2020, Plaintiff testified he had worked as an auto body technician for over 30 years. Tr. at 34. He stated he last worked in March 2015, when he was injured while removing the seats from a Nissan pickup truck. *Id.* He said he was attempting to maneuver a seat out of place when he felt a pop and a fiery sensation in his lower back. *Id.* He indicated he immediately informed his supervisor he had been injured. *Id.* He said he initially went home, but visited his family doctor upon realizing the seriousness of the injury. *Id.* He stated his doctor ordered x-rays and informed him he needed to follow up with a neurosurgeon. Tr. at 35. He indicated the Workers' Compensation insurer referred him to Dr. Aymond, who initially recommended injections. *Id.* He testified the injections were ineffective and he needed fusion surgery from L4 to S1 on July 1, 2015. *Id.* He

said his pain was worse following surgery and he ultimately needed revision surgery in September 2016. Tr. at 35–36. He testified his pain remained the same following revision surgery. Tr. at 36. He described the pain as mostly in his lower back with some radiation into his hip and legs. *Id.*

Plaintiff indicated he also had severe pain in his neck and upper spine. *Id.* He said he had pain and numbness in his hands that was worse on the left and caused difficulty gripping items. Tr. at 36–37. He confirmed he had been diagnosed with carpal tunnel syndrome. Tr. at 37. He described difficulty opening jars, writing, and holding a full glass of liquid. *Id.* He said glaucoma and difficulty focusing caused problems using a computer. Tr. at 38. He stated ocular migraines caused vision problems and neck problems caused headaches. Tr. at 38–39. He indicated the ocular migraines occurred weekly to monthly and lasted for a couple hours at a time. Tr. at 39.

Plaintiff testified he spent the majority of most days in an easy chair. *Id.* He said he would get up and do as much as he could for a few minutes before returning the chair for a while. *Id.* He stated he would sit for 10 to 20 minutes, depending on the comfort of the chair. Tr. at 40. He estimated he could stand for about 10 minutes. *Id.* He indicated he could walk for 100 yards, turn around, and walk back. *Id.* He said Gabapentin affected his vision and his pain medication caused mild constipation. Tr. at 41. He stated his pain interrupted his sleep such that he slept for only about three hours

during the night. *Id.* He said he would sleep for a couple of hours during the day, as well. Tr. at 42. He testified he had difficulty completing the function report for his Social Security disability claim and required his wife's help. *Id.* He confirmed he attended 45-minute church services at least once a month. Tr. at 43. He said his back pain was "pretty bad" by the end of a service. *Id.*

Plaintiff testified he could lift a maximum of 20 pounds once a day. Tr. at 43–44. He said he prepared quick meals and washed clothes once in a while. Tr. at 44. He indicated he followed a list and leaned on the cart when he occasionally shopped for groceries. *Id.*

### b.    Vocational Expert Testimony

Vocational Expert ("VE") Carey Washington reviewed the record and testified at the hearing. Tr. at 45–49. The VE categorized Plaintiff's PRW as an automobile body technician, *Dictionary of Occupational Titles* ("*DOT*") No. 807.381-010, as requiring medium exertion and a specific vocational preparation ("SVP") of 7. Tr. at 45. The ALJ described a hypothetical individual of Plaintiff's vocational profile who could perform sedentary work requiring no climbing of ladders, ropes, or scaffolds; occasional stooping, kneeling, crouching, crawling, and climbing of ladders, ropes, or scaffolds; and no work at unprotected heights. Tr. at 46. The VE testified the hypothetical individual could perform sedentary jobs with an SVP of 2 as a telephone quotation clerk, *DOT* No. 237.367-048, an addresser, *DOT* No.

209.587-010, and an inspector, *DOT* No. 669.687-014, with 100,000, 100,000, and 150,000 positions in the national economy, respectively. Tr. at 47–48.

The ALJ asked the VE if any jobs would be available if the individual were off-task for 20% of an eight-hour workday on a consistent basis. Tr. at 48. The VE testified there would be no substantial work. *Id.*

The ALJ asked the VE if there would be jobs available if the individual were to be absent three days per month on a consistent basis. *Id.* The VE stated there would be no jobs available. *Id.*

Plaintiff's counsel asked the VE to indicate what percentage of off-task time rendered an individual unemployable. *Id.* The VE testified that 10% of time off-task would generally be allowed during a training period, no more than 15% of time off-task would be permitted, and any time off-task above 10% would raise concern. *Id.*

Plaintiff's counsel asked the VE to indicate the maximum number of days an individual could be absent per month on a consistent basis. *Id.* The VE testified one absence per month during a training period would generally be permitted and two or more absences per month after the training period would generally render the individual unemployable. Tr. at 48–49.

2.    The ALJ's Findings

In his decision dated October 28, 2020, the ALJ made the following findings of fact and conclusions of law:

1.    The claimant meets the insured status requirements of the Social Security Act through December 31, 2020.

2.    The claimant has not engaged in substantial gainful activity since March 19, 2015, the alleged onset date (20 CFR 404.1571 *et seq.*).

3.    The claimant has the following severe impairments: degenerative disc disease and neuropathy (20 CFR 404.1520(c)).

4.    The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526).

5.    After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform sedentary work as defined in 20 CFR 404.1567(a) except the claimant can never climb ladders, ropes, or scaffolds; can occasionally climb ramps and stairs, stoop, kneel, crouch, and crawl; and he must avoid working at unprotected heights.

6.    The claimant is unable to perform any past relevant work (20 CFR 404.1565).

7.    The claimant was born on November 9, 1972 and was 42 years old, which is defined as a younger individual age 18–44, on the alleged disability onset date (20 CFR 404.1563).

8.    The claimant has at least a high school education (20 CFR 404.1564).

9.    Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferrable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10.    Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569, and 404.1569(a)).

11.    The claimant has not been under a disability, as defined in the Social Security Act, from March 19, 2015, through the date of this decision (20 CFR 404.1520(g)).

Tr. at 17–25.

II.    Discussion

Plaintiff argues the case should be remanded to the agency for consideration of new evidence pursuant to sentence six of 42 U.S.C. § 405(g). In the alternative, he alleges the Commissioner erred for the following reasons:

1)    the ALJ improperly rejected opinions from Drs. Johnson and Smith; and

2)    the ALJ failed to properly evaluate Plaintiff's subjective complaints of pain.

The Commissioner counters that the case should not be remanded under sentence six of 42 U.S.C. 405(g), that substantial evidence supports the ALJ's findings, and that the ALJ committed no legal error in his decision.

A.    Legal Framework

1.    The Commissioner's Determination-of-Disability Process

The Act provides that disability benefits shall be available to those persons insured for benefits, who are not of retirement age, who properly apply, and who are under a "disability." 42 U.S.C. § 423(a). Section 423(d)(1)(A) defines disability as:

the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for at least 12 consecutive months.

42 U.S.C. § 423(d)(1)(A).

To facilitate a uniform and efficient processing of disability claims, regulations promulgated under the Act have reduced the statutory definition of disability to a series of five sequential questions. *See, e.g., Heckler v. Campbell*, 461 U.S. 458, 460 (1983) (discussing considerations and noting "need for efficiency" in considering disability claims). An examiner must consider the following: (1) whether the claimant is engaged in substantial gainful activity; (2) whether he has a severe impairment; (3) whether that impairment meets or equals an impairment included in the Listings;[3] (4) whether such impairment prevents claimant from performing PRW;[4] and (5) whether the impairment prevents him from doing substantial gainful employment. *See* 20 C.F.R. § 404.1520. These considerations are sometimes

---

[3] The Commissioner's regulations include an extensive list of impairments ("the Listings" or "Listed impairments") the Agency considers disabling without the need to assess whether there are any jobs a claimant could do. The Agency considers the Listed impairments, found at 20 C.F.R. part 404, subpart P, Appendix 1, severe enough to prevent all gainful activity. 20 C.F.R. § 404.1525. If the medical evidence shows a claimant meets or equals all criteria of any of the Listed impairments for at least one year, he will be found disabled without further assessment. 20 C.F.R. § 404.1520(a)(4)(iii). To meet or equal one of these Listings, the claimant must establish that his impairments match several specific criteria or are "at least equal in severity and duration to [those] criteria." 20 C.F.R. § 404.1526; *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990); *see Bowen v. Yuckert*, 482 U.S. 137, 146 (1987) (noting the burden is on claimant to establish his impairment is disabling at Step 3).

[4] In the event the examiner does not find a claimant disabled at the third step and does not have sufficient information about the claimant's past relevant work to make a finding at the fourth step, he may proceed to the fifth step of the sequential evaluation process pursuant to 20 C.F.R. § 404.1520(h).

referred to as the "five steps" of the Commissioner's disability analysis. If a decision regarding disability may be made at any step, no further inquiry is necessary. 20 C.F.R. § 404.1520(a)(4) (providing that if Commissioner can find claimant disabled or not disabled at a step, Commissioner makes determination and does not go on to the next step).

A claimant is not disabled within the meaning of the Act if he can return to PRW as it is customarily performed in the economy or as the claimant actually performed the work. *See* 20 C.F.R. Subpart P, § 404.1520(a), (b); Social Security Ruling ("SSR") 82-62 (1982). The claimant bears the burden of establishing his inability to work within the meaning of the Act. 42 U.S.C. § 423(d)(5).

Once an individual has made a prima facie showing of disability by establishing the inability to return to PRW, the burden shifts to the Commissioner to come forward with evidence that claimant can perform alternative work and that such work exists in the economy. To satisfy that burden, the Commissioner may obtain testimony from a VE demonstrating the existence of jobs available in the national economy that claimant can perform despite the existence of impairments that prevent the return to PRW. *Walls v. Barnhart*, 296 F.3d 287, 290 (4th Cir. 2002). If the Commissioner satisfies that burden, the claimant must then establish that he is unable to perform other work. *Hall v. Harris*, 658 F.2d 260, 264–65 (4th

Cir. 1981); *see generally Bowen v. Yuckert*, 482 U.S. 137, 146. n.5 (1987) (regarding burdens of proof).

2.    The Court's Standard of Review

The Act permits a claimant to obtain judicial review of "any final decision of the Commissioner [] made after a hearing to which he was a party." 42 U.S.C. § 405(g). The Supreme Court has interpreted 42 U.S.C. § 405(g) to authorize only two types of remands: (1) "remand in conjunction with a judgment affirming, modifying, or reversing" the Commissioner's decision under sentence four; and (2) "remand in light of additional evidence without making any substantive ruling as to the correctness of the [Commissioner's] decision, but only if the claimant shows good cause for failing to present the evidence earlier." *Melkonyan v. Sullivan*, 501 U.S. 89, 99–100 (1991). The Supreme Court stated "Congress's explicit delineation in § 405(g) regarding the circumstances under which remands are authorized leads us to conclude that it intended to limit the district court's authority to enter remand orders to these two types." *Id.* at 100.

Federal court review pursuant to sentence four is narrowly-tailored to determine whether the findings of the Commissioner are supported by substantial evidence and whether the Commissioner applied the proper legal standard in evaluating the claimant's case. *See id.*, *Richardson v. Perales*,

402 U.S. 389, 390 (1971); *Walls v. Barnhart*, 296 F.3d 287, 290 (4th Cir. 2002) (*citing Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990)).

The court's function is not to "try these cases de novo or resolve mere conflicts in the evidence." *Vitek v. Finch*, 438 F.2d 1157, 1157–58 (4th Cir. 1971); *see Pyles v. Bowen*, 849 F.2d 846, 848 (4th Cir. 1988) (*citing Smith v. Schweiker*, 795 F.2d 343, 345 (4th Cir. 1986)). Rather, the court must uphold the Commissioner's decision if it is supported by substantial evidence. "Substantial evidence" is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson*, 402 U.S. at 390, 401; *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005). Thus, the court must carefully scrutinize the entire record to assure there is a sound foundation for the Commissioner's findings and that her conclusion is rational. *See Vitek*, 438 F.2d at 1157–58; *see also Thomas v. Celebrezze*, 331 F.2d 541, 543 (4th Cir. 1964). If there is substantial evidence to support the decision of the Commissioner, that decision must be affirmed "even should the court disagree with such decision." *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1972).

B.    Analysis

1.    Motion For Sentence Six Remand

Plaintiff has moved the court to remand the case to the Commissioner for consideration of new and material evidence, pursuant to sentence six of 42

U.S.C. § 405(g). [ECF Nos. 19, 21 at 11–17]. He bases his motion on Dr. Johnson's June 17, 2021 IME report. [ECF No. 19-1]. The report reflects the following: Plaintiff continued to report low back and bilateral leg pain he rated as a six. *Id.* at 1. Dr. Johnson observed Plaintiff's ROM to be "extremely limited but predictable and appropriate for his fusion surgeries." *Id.* He noted Plaintiff was tender to the right of midline and in the area of the sciatic notch, had paresthesia in the posterior aspect of both legs with SLR, no clonus of long tract findings, and demonstrated antalgic gait. *Id.* His impressions were status post multiple spine surgeries with instrumented multilevel fusion surgery and chronic pain on chronic narcotics. *Id.* at 2. He wrote the following:

> This patient is unemployable in my opinion. He definitively needs care with a pain management physician. He may be a candidate for spinal cord stimulator or radiofrequency ablation.
>
> I have reviewed the treating physician's statement completed by treating physician Dr. Michael Smith. I agree with the assessment by this physician and limitations that have been placed. I agree because the patient's prescription medication and pain that he would have significant limitations at the work place with increasing symptoms. Further, I have stated previously in my 2018 medical record I do not feel the patient is employable and I am in agreement with Dr. Smith in this regard also.

*Id.* Plaintiff's counsel and her paralegal represent that they made repeated efforts to obtain an updated opinion from Dr. Smith while the case remained pending at the administrative level and subsequently reached out to Dr. Johnson after Dr. Smith communicated that he was unable to provide an

updated opinion and the Appeals Council denied review. [ECF Nos. 19-2 and 19-3].

Plaintiff maintains he had good cause for failing to incorporate Dr. Johnson's June 2021 statement into the administrative record because he obtained the statement as soon as it became clear that Dr. Smith was unable to provide a statement rebutting the ALJ's conclusions. [ECF No. 21 at 14–15]. He contends the statement is new, as it provides insight into earlier statements the ALJ found unpersuasive, is related to the period before the ALJ, and contains information in addition to that included in Dr. Johnson's earlier statement. *Id.* at 15–16; ECF No. 31 at 6. He claims the statement is material because the ALJ's decision might reasonably have been different if he had reviewed it. *Id.* at 16. He asserts Dr. Johnson' opinion was bolstered by his specialization as a spinal surgeon. [ECF No. 31 at 6].

The Commissioner argues Dr. Johnson's June 2021 report is not new evidence because Plaintiff could have obtained a rebuttal statement from Dr. Johnson while the administrative proceedings were ongoing. [ECF Nos. 25 at 3 and 26 at 15–16]. She maintains the report is not material because it was rendered after Plaintiff's date last insured. [ECF Nos. 25 at 3 and 26 at 16]. She further contends Dr. Johnson's June 2021 report provides nothing in addition to the information the ALJ already considered in examining the 2018 opinion. [ECF Nos. 25 at 4 and 26 at 16–17]. She claims Plaintiff has

not shown good cause for his failure to submit the evidence while the case was pending at the Appeals Council level because he did not have to wait for Dr. Smith to decline to provide an opinion before seeking one from Dr. Johnson. [ECF Nos. 25 at 4 and 26 at 17].

The sixth sentence of 42 U.S.C. § 405(g) authorizes remand under two circumstances: (1) if the Commissioner files a motion showing good cause for remand, prior to filing an answer; or (2) at any time, if new, material evidence is discovered and there is good cause for the failure to incorporate such evidence into the record in the prior proceedings. 42 U.S.C. § 405(g). Because Plaintiff has moved for remand pursuant to sentence six, the court considers whether the second criterion is met. This requires the court determine whether: (1) the evidence is new; (2) the evidence is material; and (3) there was good cause for failure to incorporate the evidence into the record during the administrative proceedings.

"Evidence is new 'if it is not duplicative or cumulative' and is material if there is 'a reasonable possibility that the new evidence would have changed the outcome.'" *Meyer v. Astrue*, 662 F.3d 700, 705 (4th Cir. 2011) (quoting *Wilkins v. Sec'y, Dep't of Health & Human Servs.*, 953 F.3d 93, 96 (4th Cir. 1991)). A sentence six remand may be "appropriate when the district court learns of evidence not in existence or available to the claimant at the time of

the administrative proceeding that might have changed the outcome of that proceeding." *Sullivan v. Finkelstein*, 496 U.S. 617, 627 (1990).

Plaintiff bears the burden to show good cause for the failure to submit the evidence at the administrative level. *See Hammond v. Apfel*, 5 Fed. App'x 101, 104 (4th Cir. 2001). "The good cause prerequisite obligates a plaintiff to demonstrate a reasonable justification for the failure to acquire and present the evidence at the administrative level." *Jardine v. Saul*, C/A No. 1:19-cv-12, 2020 WL 4778184, at *14 (M.D.N.C. Sept. 1, 2020) (citing *Combs v. Astrue*, C/A No. 5:06-cv-72, 2007 WL 1129398, at *6 (W.D.Va. Apr. 17, 2007)) (internal citation omitted). "The Fourth Circuit has suggested a high bar for establishing 'good cause' for a sentence six remand." *Jones v. Colvin*, C/A No. 6:12-cv-67, 2014 WL 359672, at *10 (W.D.Va. Feb. 3, 2014) (citing *Hammond*, 5 Fed. App'x at 103 ("Without any explanation as to why his workman's compensation would not cover treatment earlier, we find that (plaintiff) has failed to demonstrate 'good cause' to excuse his failure to submit [new evidence].")); *Wooding v. Comm'r of Soc. Sec.*, C/A No. 4:10-cv-6, 2010 WL 4261268, at *4 (W.D.Va. Oct. 29, 2010) ("Good cause does not exist based solely on Plaintiff's after-the-fact desire to contradict the Vocational Expert's opinion and the ALJ's subsequent findings."); *Rogers v. Barnhart*, 204 F. Supp. 2d 885, 892 (W.D.N.C. 2002) ("Plaintiff's failure to present such evidence to the Appeals Council is not good cause. Ultimately, it is plaintiff

who bears the initial burden of production of evidence and the ultimate burden of persuasion.")).

A comparison of Dr. Johnson's 2018 and 2021 opinions demonstrates few differences. In March 2018, Dr. Johnson observed Plaintiff to have "somewhat antalgic" gait and paresthesia throughout the posterior aspect of his right lower extremity. Tr. at 376. In June 2021, Dr. Johnson similarly noted antalgic gait and paresthesia in the posterior aspect of both legs. [ECF No. 19-1 at 1]. He found TTP and extremely limited, but predictable ROM, given Plaintiff's history of fusion surgeries. *Id.* Although Dr. Johnson documented deficits in ROM in 2021 that he did not document in 2018, it was not because there were no deficits in 2018, but because he did not specifically test Plaintiff's ROM during that exam. *See* Tr. at 376 (noting he declined to perform a rigorous manual motor exam); ECF No. 19-1 at (indicating deficits in ROM were predictable given Plaintiff's history of fusion surgeries).

The ALJ considered TTP and deficits in ROM documented in other medical records, suggesting Dr. Johnson's findings of TTP and reduced ROM were duplicative of other evidence. *See* Tr. at 19–22 (acknowledging "some diminished range of motion in the back" in April 2015; "tenderness and spasm in the lumbar region" during a May 2016 exam; TTP in the lumbar spine and limited lumbar ROM in August 2016; decreased ROM in the lumbar spine in April 2017; diffuse tenderness along the lumbosacral

junction in May 2017; tenderness in the lumbar region in October 2017; tenderness to the lumbar spine in August 2018; TTP in the lumbar region bilaterally in April 2019; and findings of tenderness in the lumbar spine in 2020).

In addressing Plaintiff's treatment and prognosis during the March 2018 exam, Dr. Johnson noted a SCS was a possible treatment option, but one Plaintiff was unwilling to pursue. Tr. at 377. He indicated Plaintiff was at-risk for spinal breakdown above his fusion site, would need monthly medical follow up, was not employable, could not return to his past vocation, should avoid repetitive bending, could not lift over 10 pounds, could not do sedentary work because his medications would cause sedation and loss of time from work, and would need to move from sitting, standing, and walking every 10 to 15 minutes. *Id.* He provided fewer, but similar impressions in June 2021, stating Plaintiff was unemployable, needed pain management care, might be a candidate for an SCS or radiofrequency ablation, and would be limited in the workplace due to medications and pain. [ECF No. 19-1 at 2]. Therefore, the 2021 report is largely duplicative of Dr. Johnson's prior opinion.

Dr. Johnson's 2021 report and opinion was not material because it was unlikely to change the ALJ's decision. The ALJ considered Dr. Johnson's 2018 opinion unpersuasive. Although Plaintiff argues the ALJ did not provide

reasons for rejecting all the purported limitations in Dr. Johnson's 2018 opinion that were also included in the 2021 opinion, it is inappropriate to address that issue in determining whether a sentence six remand is appropriate. *See Melkonyan*, 501 U.S. at 98 (providing if the district court orders remand pursuant to sentence six, it "does not affirm, modify, or reverse the [Commissioner's] decision; it does not rule in any way as to the correctness of the administrative determination"). It is sufficient that the ALJ found unpersuasive another opinion providing essentially the same restrictions from the same medical source. Given the similarities between the opinions, it is reasonable to expect the ALJ would have found Dr. Johnson's June 2021 exam equally unpersuasive.

A review of the record suggests Plaintiff lacked good cause for his failure to obtain and submit additional evidence from Dr. Johnson at the administrative level. More than five months elapsed between the ALJ's issuance of the unfavorable decision and the Appeals Council's issuance of the decision denying review. Tr. at 1–6, 12–29. Counsel represents that over this period, she first sought a rebuttal opinion from Dr. Smith prior to reaching out to Dr. Johnson. [ECF No. 19-2 at 1–2]. Although the court recognizes the financial constraints imposed due to the administrative fee cap and Social Security claimants' limited financial means, Counsel ultimately chose to pursue a rebuttal opinion from Dr. Smith instead of reaching out to

Dr. Johnson for a similar opinion while the case was pending at the administrative level.

Although Counsel's and her paralegal's affidavits indicate multiple efforts to obtain a statement from Dr. Smith while the case was pending at the Appeals Council, they do not reflect diligent efforts to complete the record at the administrative level. *See* ECF Nos. 19-2, 19-3. A letter from the Appeals Council dated December 23, 2020, informed Counsel that "[i]f you have more information, you must send it to us within 25 days of the date of this letter," and that it would "not allow more time to send information except for very good reasons." Tr. at 7. The record contains no communication from Counsel requesting additional time to submit a rebuttal opinion and maintaining she had good reason for her request. Counsel admits she learned Dr. Smith would be unable to provide a rebuttal opinion on March 26, 2021, more than a week prior to the Appeals Counsel's issuance of its decision. *Id.* at 2; *see also* Tr. at 1–6. However, Counsel did not contact the Appeals Counsel to request additional time to submit evidence from Dr. Johnson at that time and did not reach out to Dr. Johnson immediately upon learning that Dr. Smith would be unable to provide an opinion. In fact, her paralegal indicates Counsel did not instruct her to reach out to Dr. Johnson for a rebuttal opinion until May 4, 2021, nearly a month after the Appeals Council issued its decision. [ECF No. 19-3 at 2]. In light of the foregoing, the

undersigned cannot find good cause for the failure to submit the evidence at the administrative level.

The court denies Plaintiff's request for remand pursuant to sentence six of 42 U.S.C. § 405(g), ECF No. 19, as he has not met the burden of showing the evidence was new and material and that he had good cause for failing to obtain and submit it at the administrative level.

2.    Medical Opinions

Plaintiff argues the ALJ improperly rejected Drs. Smith's and Johnson's opinions. [ECF No. 21 at 17–24]. He maintains the ALJ selectively cited from Dr. Smith's progress notes and failed to consider the length and frequency of treatment in explaining his conclusion that the opinion was "not persuas[ive]." *Id.* at 19. He further contends Dr. Smith's record as a whole supported his opinion. *Id.* at 19–22. He claims the ALJ erred in finding Dr. Johnson's opinions unpersuasive because they were consistent with each other and with the record as a whole. *Id.* at 22. He asserts the ALJ did not explain why Dr. Johnson's examination notes did not support his opinion as to a need to alternate positions every 10 to 15 minutes. *Id.* at 23. He further maintains the ALJ did not address Dr. Johnson's opinion as to time off-task. *Id.* at 24. He asserts that because the state agency consultants' opinions, Dr. Smith's opinion, and Dr. Johnson's opinion were equally well-supported, the

ALJ was required to articulate his findings as to factors in 20 C.F.R. § 404.1520c, in addition to supportability and consistency. [ECF No. 31 at 11].

The Commissioner argues substantial evidence supports the ALJ's consideration of Drs. Smith's and Johnson's opinions, as they were not supported by treating notes and inconsistent with other record evidence. [ECF No. 26 at 11–14].

In his decision, the ALJ must consider the persuasiveness of all the medical opinions in the record based on the following factors: (1) supportability; (2) consistency; (3) relationship with the claimant; (4) specialization; and (5) other factors that tend to support or contradict a medical opinion. 20 C.F.R. § 404.1520c(b), (c). In most cases, he is only required to articulate how he considered supportability and consistency, as they are considered the most important factors in assessing the persuasiveness of an opinion. 20 C.F.R. §§ 404.1520c(a), (b)(2). However, if the adjudicator finds two opinions to be equally well-supported and consistent with the record, he should also explain how he considered the three additional factors in assessing the persuasiveness of those opinions. 20 C.F.R. § 404.1520c(b)(3).

In evaluating supportability, "[t]he more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) . . . the more persuasive the medical

opinion . . . will be." 20 C.F.R. § 404.1520c(c)(1). As for the consistency factor, "[t]he more consistent a medical opinion . . . is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion . . . will be." 20 C.F.R. § 404.1520c(c)(2).

The ALJ's conclusion as to the persuasiveness of a medical opinion must be supported by substantial evidence. If the ALJ materially errs in evaluating the supportability and consistency of an opinion, it may be appropriate for the court to remand the case. *See Joseph M. v. Kijakazi*, C/A No. 1:20-3664-DCC-SVH, 2021 WL 3868122, at *13 (D.S.C. Aug. 19, 2021) (finding the ALJ erred in assessing a medical opinion pursuant to 20 C.F.R. § 404.1520c because he erred in stating the date the plaintiff last saw the medical provider, neglected the continuing treatment relationship, and erroneously claimed the last treatment visit was prior to the plaintiff's alleged onset date), adopted by 2021 WL 3860638 (D.S.C. Aug. 30, 2021).

Here, the ALJ explained his consideration of the opinion evidence as follows:

> With regard to his physical impairments, the undersigned finds persuasive the opinion of the State agency medical consultants. The State agency medical consultants opined that the claimant could perform sedentary work; occasionally climb and perform all postural activities; and must avoid concentrated exposure to hazards (Ex. 2A, 4A). These consultants supported their opinions with reference to the record and with their knowledge of program requirements. Their opinions are generally consistent with the objective medical evidence. As noted above, the objective medical evidence is consistent with less than sedentary work. This would

accommodate the claimant's lumbar tenderness and limited range of motion, while also acknowledging that he has full range of motion in his upper and lower extremities, negative straight leg raise testing, and a generally normal gait (Ex. 3F, 6F).

The undersigned is not persuaded by the August 2020 opinion of Michael R. Smith, MD that the claimant could lift and carry less than 10 pounds; stand, walk, or sit for less than two hours in an eight-hour workday; would need a cane for walking on rough/uneven terrain, or bending or stooping; could occasionally bend, handle, finger or feel; would be off task 20%–50% of the workday; and would miss four or more days per month of work (Ex. 18F). Dr. Smith's opinion is not supported by his own treatment notes, which show full range of motion in the upper and lower extremities, negative straight leg raise testing, and a normal gait (Ex. 3F, 6F, 16F). His opinion is also not consistent with other evidence in the record showing that the claimant's pain was controlled with medication, and showing improvement following surgery (Ex. 4F, 13F). The opinions of the State agency consultants are more consistent with the record as a whole.

The undersigned also finds unpersuasive the March 2018 opinion of independent medical evaluator Dr. Johnson that the clamant was not employable, and could not return to his past work. He should avoid repetitive bending and lifting and not lift over 10 pounds. He could do sedentary work and would need to change positions every 10–15 minutes (Ex. 4F). Dr. Johnson partially supported his opinion with his examination notes, which showed lumbar and hip pain and a somewhat antalgic gait as well as paresthesias through the posterior aspect of his right lower extremity (Ex. 4F at 4). The weight of the objective medical evidence, however, is not consistent with the need to change positions every 10–15 minutes. Treatment notes throughout the record show full range of motion in the upper and lower extremities, negative straight leg raise testing, and a normal gait (Ex. 3F, 6F, 16F). Thus, while the undersigned agrees that the claimant would be limited to sedentary work, the need to change positions is not consistent with the objective medical evidence.

Tr. at 23.

Contrary to Plaintiff's argument, this was not a case in which the ALJ found multiple opinions to be equally well-supported and consistent with the record. The ALJ indicated he found the state agency consultants' opinions persuasive, as they were supported by their references to the record and consistent with the objective medical evidence. *See id.* He found Dr. Smith's opinion unpersuasive, as it was not supported by his treatment notes and was inconsistent with the other evidence of record. *See id.* He concluded Dr. Johnson's opinion was partially supported by his examination notes, but was ultimately unpersuasive because it was not consistent with the weight of the objective evidence. *See id.* Because the ALJ did not consider the opinions equally well-supported and consistent with the record, he was not required to explain how he considered the three additional factors in assessing the persuasiveness of those opinions. *See* 20 C.F.R. § 404.1520c(b), (c).

The undersigned has considered whether substantial evidence supports the ALJ's conclusions as to the supportability and consistency of the opinion evidence. Although the ALJ specified he found Dr. Smith's opinion unpersuasive, his RFC assessment limited Plaintiff to sedentary work with occasional stooping, kneeling, and crouching, which was generally consistent with Dr. Smith's impressions as to Plaintiff's lifting, carrying, standing, walking, and bending abilities. The ALJ effectively rejected Dr. Smith's

opinion as to sitting limitations, need for a cane, handling, fingering, feeling, time off-task during the workday, and absences.

Although Plaintiff argues the ALJ failed to thoroughly explain his reasons for rejecting those limitations in Dr. Smith's opinion, a review of the ALJ's decision as a whole provides sufficient explanation. In discussing the severity of Plaintiff's impairments at step two, the ALJ wrote:

> In April 2020, the claimant presented for a nerve conduction study, complaining of "years" of numbness and tingling in his hands. On examination, he had full strength in both upper extremities. Neurological findings were normal. A nerve conduction study demonstrated mild bilateral CTS, worse on the left. The readings were borderline normal (Ex. 15F).

Tr. at 18. He further noted there was no indication the impairment caused Plaintiff more than minimal functional limitations. *Id.* This conclusion is supported by Plaintiff's description to his provider of occasional bilateral upper extremity numbness that started in his hands, worked its way up to his arms, and occurred while driving and mainly at night. Tr. at 586. It serves as sufficient reason for the ALJ's rejection of the handling, fingering, and feeling restrictions Dr. Smith indicated.

The ALJ's reference to normal gait, full strength in the extremities, and absence of foot drop during most of Plaintiff's exams serves as objective evidence in support of his rejection of Dr. Smith's impression that Plaintiff would require a cane at times. *See* Tr. at 20–23. Contrary to Plaintiff's assertion, the ALJ did not cherrypick the facts and ignore evidence of

decreased bending/flexion in his lower back, TTP, and increased pain in the paraspinal musculature. *See* Tr. at 21–22 (acknowledging decreased ROM in the lumbar spine in April 2017, diffuse tenderness along the lumbosacral junction in May 2017, tenderness and spasm in the lumbar region in October 2017, paraspinal muscle spasm in the lumbar region and tenderness to the lumbar spine in August 2018, paraspinal spasm in the lumbar region, TTP over the lumbar region bilaterally, and decreased bending/anterior flexion of the low back secondary to pain in April 2019, limited flexion and extension of the back and increased pain in the paraspinal musculature of the cervical spine in July 2019, and decreased ROM and tenderness in the lumbar spine in 2020). He considered the positive findings to the extent they supported the restrictions Dr. Smith provided that were consistent with the other evidence, including the state agency consultants' opinions.

As for Dr. Smith's impressions that Plaintiff could sit for less than two hours in an eight-hour period, would be off-task 20–50% of the time, and would be absent four or more days per month, the ALJ explained such restrictions were not consistent with Plaintiff's reports to his physicians of good pain control on his medications and evidence of his improvement following the second surgery. Tr. at 21–23. The record generally supports the ALJ's conclusions as to the effectiveness of Plaintiff's pain medications and improvement following surgery. *See, e.g.*, Tr. at 348 (pain improved by 25%

following revision surgery), 351 (Percocet, Neurontin, and Flexeril all seemed to help), 490 (using Percocet intermittently, Tramadol for breakthrough pain, and Meloxicam as an anti-inflammatory without complications and otherwise doing well), 492 (continues to take Percocet for pain control with good results), 496 (requests refills of Percocet, Tramadol, and Neurontin and reports no complications from medications and significant improvement to functional status), 507 (describes pain as a two to three with medication and an eight to nine without it and denies negative side effects from medications), 584 (uses Tramadol and anti-inflammatories with good results), 586 (uses Percocet for pain control with good results, significantly improved functional status, and no complications).

The ALJ did not specifically address Dr. Johnson's impression as to time off-task, but addressed the issue in discussing Dr. Smith's opinion and concluded that a significant period of time off-task was inconsistent with Plaintiff's reports to his medical providers. *See* Tr. at 23. As Dr. Johnson only generally referenced the imaging reports and diagnostic testing and failed to explain how this evidence supported the time off-task he indicated, the ALJ was not required to provide a more robust explanation in rejecting that element of his opinion. The ALJ conceded Dr. Johnson's findings partially supported his opinion, but he rejected his impression that Plaintiff would need to shift between sitting, standing, and walking every 10 to 15 minutes

as inconsistent with findings of full ROM of the upper and lower extremities, normal gait, and negative SLR test. Tr. at 23. An individual with full ROM of the extremities, no gait disturbance, and no underlying nerve-root sensitivity would reasonably be expected to sit, stand, and walk for longer periods than Dr. Johnson indicated. Again, Dr. Johnson provided no explanation, aside from general citations to the imaging reports and diagnostic testing, for the time limitations he imposed on sitting, standing, and walking. Although Plaintiff maintains the physical therapy records supported the sitting, standing, and walking limitations Dr. Johnson suggested, those records lend no greater support to the opinion, as they reflect a duty level of "sedentary" and Plaintiff's reports of sitting, standing, and walking as aggravating factors, but contain no observations as to how long he could maintain a position. *See generally* Tr. at 279–323.

The ALJ considered the supportability and consistency of Drs. Smith's and Johnson's opinions, and substantial evidence supports his conclusion that the opinions were unpersuasive.

### 3.    Subjective Symptom Evaluation

Plaintiff argues the ALJ failed to properly evaluate his subjective complaints of pain. [ECF No. 21 at 24–27]. He maintains his allegations are supported by his consistent complaints throughout the record, physical

therapy notes, and findings on physical exams. *Id.* at 26. He asserts the ALJ mischaracterized the record as to ROM findings. *Id.* at 26–27.

The Commissioner argues substantial evidence supports the ALJ's conclusion that Plaintiff's subjective complaints were not entirely consistent with the other evidence. [ECF No. 26 at 17]. She maintains the ALJ acknowledged that Plaintiff struggled with his impairments, but represented to his physicians that his pain medication controlled his symptoms well without side effects, walked with normal gait, had full strength, had full ROM in his extremities, had negative SLR tests, and engaged in a wide range of activities of daily living ("ADLs"). *Id.* at 18–19.

Plaintiff counters that the Commissioner is attempting to provide impermissible post hoc rationalization to support the ALJ's decision, as he did not cite ADLs as a basis for his decision. [ECF No. 31 at 1]. He maintains his limited activities failed to contradict his testimony. *Id.* at 4. He contends the ALJ made no findings as to the degree to which his medication was controlling his symptoms. *Id.*

"Under the regulations implementing the Social Security Act, an ALJ follows a two-step analysis when considering a claimant's subjective statements about impairments and symptoms." *Lewis v. Berryhill*, 858 F.3d 858, 865–66 (4th Cir. 2017) (citing 20 C.F.R. § 404.1529(b), (c)). If the evidence supports a finding that the claimant's medically determinable

impairments could reasonably be expected to cause his alleged symptoms at the first step, he is "entitled to rely exclusively on subjective evidence to prove" his symptoms are "so continuous and/or so severe that [they] prevent [him] from working a full eight hour day" at the second step. *Hines v. Barnhart*, 453 F.3d 559, 565 (4th Cir. 2006).

The ALJ must consider "whether there are any inconsistencies in the evidence and the extent to which there are any conflicts between [the claimant's] statements and the rest of the evidence." 20 C.F.R. § 404.1529(c)(4). Other evidence relevant to the evaluation includes "statements from the individual, medical sources, and any other sources that might have information about the claimant's symptoms, including agency personnel, as well as the factors set forth in [the] regulations," which include: (1) the claimant's ADLs; (2) the location, duration, frequency, and intensity of the claimant's pain or other symptoms; (3) any precipitating or aggravating factors; (4) the type, dosage, effectiveness, and side effects of any medication the claimant takes or has taken to alleviate pain or other symptoms; (5) treatment, other than medication, the claimant receives or has received for relief of pain or other symptoms; (6) any measures the claimant uses or has used to relieve pain or other symptoms; and (7) other factors concerning the claimant's functional limitations and restrictions due to pain or other symptoms. 20 C.F.R. § 404.1529(c)(3); SSR 16-3p, 2017 WL 5180304, at *6.

The ALJ must explain which of the claimant's symptoms he found "consistent or inconsistent with the evidence in [the] record and how [his] evaluation of the individual's symptoms led to [his] conclusions." SSR 16-3p, 2017 WL 5180304, at *8.

The ALJ determined Plaintiff's medically-determinable impairments could reasonably be expected to cause the symptoms he alleged, but that his statements concerning the intensity, persistence, and limiting effects of his symptoms were not entirely consistent with the evidence. Tr. at 19. He considered the ADLs Plaintiff reported in his testimony. *Id.* He summarized the evidence, citing positive and negative findings, Tr. at 19–22, and wrote the following:

> The above evidence shows that the claimant has struggled with degenerative disc disease and neuropathy with two lumbar surgeries. Although the claimant complained of continued pain at the hearing, he told his physicians that his pain medication was controlling his symptoms. Despite his alleged pain, physical findings were consistent with sedentary work. The claimant had tenderness and some reduced lumbar range of motion, but negative straight leg raise testing, full strength, full range of motion in all extremities, and generally normal gait.

Tr. at 22. He discussed the medical opinions of record, finding the state agency consultants' opinions to be persuasive and the treating and examining physicians' opinions to be unpersuasive. Tr. at 22–23.

"In evaluating the intensity, persistence, and limiting effects of a claimant's symptoms, ALJs may consider the claimant's daily activities."

*Arakas v. Commissioner, Social Security Administration*, 983 F.3d 83, 99 (4th Cir. 2020) (citing 20 C.F.R. § 404.1529(c)(3)(i). Although the ALJ noted Plaintiff's testimony as to his ADLs, Tr. at 19, he did not claim that his ADLs were inconsistent with his allegations. The court is constrained to consider only the reasons the ALJ provided to support his conclusion as to Plaintiff's alleged symptoms. *See Robinson ex rel. M.R. v. Commissioner of Social Sec.*, C/A No. 0:07-3521-GRA, 2009 WL 708267, at *12 (D.S.C. Mar. 12, 2009) ("[T]he principles of agency law limit this Court's ability to affirm based on post hoc rationalizations by the Commissioner's lawyers. '[R]egardless [of] whether there is enough evidence in the record to support the ALJ's decision, principles of administrative law require the ALJ to rationally articulate the grounds for [her] decision and confine our review to the reasons supplied by the ALJ.'") (quoting *Steele v. Barnhart*, 290 F.3d 936, 941 (7th Cir. 2002)). Because the ALJ indicated nothing to the contrary, he presumably accepted Plaintiff's testimony that he "spen[t] the majority of his day in an easy chair and d[id] as little as possible." *See* Tr. at 19.

The ALJ's decision reflects his rejection of Plaintiff's statements concerning the intensity, persistence, and limiting effects of his symptoms based on: (1) the objective evidence; (2) Plaintiff's statements to his providers about his pain; and (3) the state agency consultants' opinions. Therefore, the

court considers whether these reasons serve as substantial evidence to support the ALJ's conclusion.

The ALJ referenced objective evidence he considered inconsistent with Plaintiff's allegations. The ALJ did not reach the second step of the evaluation with respect to carpal tunnel syndrome because he concluded the evidence did not support a finding that the impairment could reasonably be expected to cause the symptoms Plaintiff alleged. He consequently declined to impose any manipulative restrictions, despite Plaintiff's testimony that he had difficulty gripping, opening jars, writing, and holding a full glass. In accordance with SSR 16-3p, the ALJ explained he found Plaintiff's allegations and evidence of TTP, reduced lumbar ROM, and increased pain in the paraspinal musculature supported an RFC for sedentary work. *See* Tr. at 21–22. However, he considered negative SLR testing, full strength, full ROM in the extremities, and generally normal gait contrary to Plaintiff's other allegations. *See* Tr. at 22. As discussed above, the ALJ did not misrepresent the record and acknowledged the positive and negative objective signs of Plaintiff's impairment.

The ALJ did not rely exclusively on the objective evidence to evaluate Plaintiff's allegations as to those impairments he found could reasonably be expected to cause the symptoms he alleged, but, instead, considered all the relevant evidence in accordance with 20 C.F.R. § 404.1529 and SSR 16-3p. He

evaluated Plaintiff's statements as to his ADLs, his description of his symptoms, his medical sources' statements, the treatment he received, and the measures he used to relieve his pain as partially supporting his allegations and credited this evidence in limiting him to sedentary work with additional restrictions. *See generally* Tr. at 19–23.

Although the ALJ credited this evidence, he noted Plaintiff's allegations in his hearing testimony differed from his reports in other circumstances regarding the effectiveness of his medication, some improvement following the second surgery, and his functional abilities over time. *See* Tr. at 21 ("reported trying to remain physically active, but he was unable to tolerate too much activity" in February 2018, "doing well on his current medication" in December 2018, and "stated that gabapentin was controlling his symptoms of neuropathy relatively well" in April 2019), Tr. at 22 ("he told his physicians that his pain medication was controlling his symptoms"), Tr. at 23 (indicating that Dr. Smith's opinion was "not consistent with other evidence in the record showing that the claimant's pain was controlled with medication, and showing improvement following surgery"). Thus, in contrast to *Lewis*, Plaintiff's subjective reports of pain were not consistent throughout the record. *See Lewis*, 858 F.3d at 868. The ALJ also noted the state agency consultants' impressions were inconsistent with Plaintiff's allegations as to completely disabling symptoms. Tr. at 23 (noting

state agency consultants opined that Plaintiff could perform sedentary work, they "supported their opinions with reference to the record and with their knowledge of program requirements," and their opinions were "generally consistent with the objective medical evidence"). In accordance with 20 C.F.R. § 404.1529 and SSR 16-3p, the ALJ provided reasons for rejecting Plaintiff's allegations that he was limited in his ability to use his hands, would need to change positions every 10 to 15 minutes, and would be off-task and miss work frequently due to pain. *See* Tr. at 18, 22–23.

Substantial evidence supports the ALJ's finding that Plaintiff's statements concerning the intensity, persistence, and limiting effects of his symptoms were not entirely consistent with the record, given his discussion of the relevant factors and his citation of evidence that conflicted with Plaintiff's statements.

## III.    Conclusion

For the foregoing reasons, the court denies Plaintiff's motion to remand pursuant to sentence six of 42 U.S.C. § 405(g), ECF No. 19.

The court's function is not to substitute its own judgment for that of the Commissioner, but to determine whether his decision is supported as a matter of fact and law. Based on the foregoing, the undersigned affirms the Commissioner's decision.

IT IS SO ORDERED.

March 2, 2022
Columbia, South Carolina

Shiva V. Hodges
United States Magistrate Judge